STATE OF CONNECTICUT *v.* STEPHEN J. KRIJGER
(AC 31216)

Harper, Lavine and Alvord, Js.

Argued January 6—officially released August 2, 2011

*Richard E. Condon, Jr.,* assistant public defender, for the appellant (defendant).

*Mitchell S. Brody,* senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan,* state's attorney, and *Sarah E. Steere,* senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Stephen J. Krijger, appeals from the judgment of conviction, rendered after a jury trial, of threatening in the second degree in violation of General Statutes § 53a-62 (a) (3) and breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (3). The defendant claims that the evidence was insufficient to establish that the statements on which his conviction was based constituted "true threats" as required for conviction under §§ 53a-62 (a) (3) and 53a-181 (a) (3), rather than protected speech under the first amendment to the United States constitution, as applied to the states through the fourteenth amendment. We disagree and affirm the judgment of conviction.

The jury reasonably could have found the following facts. The defendant's conviction arises out of statements that he made to the victim, Nicholas Kepple, the town attorney for Waterford, outside the New London Superior Court on July 21, 2008. The defendant had been involved in a legal dispute with the town of Waterford (town) since the mid-1990s due to various zoning violations relating to the accumulation of debris on his property located at 18 Totoket Road in the Quaker Hill section of Waterford. In 1996, the town obtained a permanent injunction barring the defendant from violating the town's zoning regulations. Subsequently, the town

obtained a court order granting it permission to enter the defendant's property to clean up the debris. The court granted the town a $17,000 lien in order to obtain payment from the defendant for the cleanup costs. Kepple first became involved in the dispute in 2000 while representing the town during the defendant's appeal from the court's order granting the lien. See *Waterford v. Krijger*, 66 Conn. App. 903, 786 A.2d 544 (2001). In 2003, the town foreclosed on the judgment lien and a lien for unpaid taxes, and the defendant paid the full amount owed, $32,000, representing $25,000 for the cleanup fees and interest, and the remainder for unpaid taxes.

After paying the judgment lien, the defendant continued to violate the injunction from 2003 until 2008, prompting Kepple to file a motion for contempt. The defendant's continued noncompliance resulted in multiple occasions where both Kepple and the defendant appeared in court. In addition, Kepple and various zoning enforcement officers visited the defendant's property forty to fifty times in regard to his continued noncompliance with the permanent injunction. Kepple testified that during his interactions with the defendant on these occasions, the defendant had always been "pleasant and cooperative . . . ."

On July 21, 2008, the defendant, representing himself, appeared in court in response to Kepple's request, on behalf of the town, that the court hold the defendant in contempt and fine him $150 per day for violations of the permanent injunction that occurred between September, 2007, and July, 2008. Kepple represented the town at the hearing, and Michael Glidden, a zoning enforcement officer for the town, testified regarding the zoning violations. At the conclusion of the hearing, the judge did not make an immediate ruling but did indicate that he would be imposing fines on the defendant for violating the permanent injunction and failing

to comply with the zoning regulations. The defendant was upset by this outcome, as he was under the impression that the town would not seek fines as long as he agreed to comply with the zoning regulations.

After the hearing, the defendant followed Kepple out of the courtroom, and the two men exchanged words. During this exchange, the defendant expressed his anger over the town's decision to seek fines and called Kepple a "liar" and an "asshole." The defendant continued to follow Kepple and Glidden as they exited the courthouse. The defendant appeared angry; his face was red and there was spit in the corner of his mouth. The defendant then stated to Kepple, "More of what happened to your son is going to happen to you," to which Kepple replied, "What did you say?" to which the defendant responded, "I'm going to be there to watch it happen."[1] Kepple then responded by saying, "You piece

---

[1] At trial, the jury was presented with testimony and evidence of varying accounts of what the defendant said to Kepple. Kepple testified that the defendant stated, "More of what happened to your son is going to happen to you," and, "I'm going to be there to watch it happen." Kepple's police report contained the same account of the defendant's statements. Glidden also testified regarding his recollection of the defendant's statements. Glidden testified that "[the defendant] said he wished ill upon [Kepple's family] and [Kepple] and that he would be there present to see that." Two hours after the incident, Glidden returned to his office and wrote down his recollection of what had occurred. In these notes, Glidden wrote that "[the defendant] told [Kepple] that he . . . wished harm and misfortune upon him and his family just like what happened to [Kepple's] son. [The defendant] then told us that he hoped that he would be present when such misfortune befalls the Kepples." Glidden also gave a statement to the police that contained the following description of the defendant's comments: "[The defendant] told . . . Kepple that he wished harm and misfortune upon him and his family just like what had happened to . . . Kepple's son. [The defendant] then told . . . Kepple that he will be present when that happens." Thus, the jury was presented with versions of the defendant's statements that differed in one relevant respect, namely, the presence or absence of precatory language.

For purposes of review, we assume that the jury credited Kepple's account of the defendant's statements, as Kepple's account is the most damaging, and, thus, is most consistent with the jury's guilty verdict. See, e.g., *State* v. *Torres*, 111 Conn. App. 575, 587, 960 A.2d 573 (2008) ("we . . . evaluate

of shit," prompting the defendant to respond by calling Kepple a "piece of shit." Kepple then stated, "But who has got your $25,000, bitch?"[2]

To place the defendant's statements in context, the following facts regarding Kepple's son are relevant. Kepple's only son had been injured in a car accident several years prior while he was an officer with the Groton town police department. The accident left Kepple's son with broken ribs and broken teeth as well as severe brain damage resulting in an inability to use the right side of his body as well as cognitive and motor impairments.[3] The accident was highly publicized in local newspapers at the time it occurred. Additionally, local newspapers published articles after the accident reporting on the progress of Kepple's son's recovery.

the evidence in light of the jury's guilty verdict [and therefore] must evaluate the evidence consistent with a finding of the defendant's guilt"), cert. denied, 290 Conn. 907, 964 A.2d 543 (2009). Moreover, as we will explain, although we engage in de novo review of the statements and the circumstances surrounding their making to determine whether they constituted "true threats," we review the jury's credibility determinations under a clearly erroneous standard of review. *Harte-Hanks Communications, Inc.* v. *Connaughton,* 491 U.S. 657, 688–89, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) ("[a]lthough credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses . . . the reviewing court must examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect" [citation omitted; internal quotation marks omitted]). In light of the evidence before the jury, we conclude that the jury reasonably could have credited Kepple's version of the events as the true depiction of the defendant's statements. As such, we review those statements and the circumstances under which they were made to determine whether they are protected speech under the first amendment.

[2] Apparently, Kepple was referring to the $25,000 the defendant previously had paid the town for cleanup costs and interest.

[3] Kepple's son suffered a spontaneous intracranial hemorrhage while driving, causing him to black out and the car he was driving to hit a tree. The severe brain injuries were caused by the intracranial brain hemorrhage, not by the accident itself. The newspapers covering the accident, however, presented the story in a manner that made it appear as though the accident caused all of the son's injuries.

Kepple testified that he did not recall if he had ever discussed his son's accident with the defendant; however, he opined that it was entirely possible, given the years of interactions with the defendant and the fact that "hundreds and hundreds" of people had asked Kepple about his son's condition in the years following the accident.

Kepple believed that the situation would escalate quickly if he did not leave the scene, so he and Glidden crossed the street. Once out of earshot of the defendant, Glidden stated to Kepple: "I think he just threatened you." Glidden testified that in response to his statement, "[Kepple] sort of didn't say anything to me, like, no, no, no, not really." The two then briefly discussed other zoning enforcement cases they were working on and parted ways. The defendant, however, proceeded to follow Glidden to his vehicle in the parking garage. Although the defendant was apologizing to Glidden, Glidden nonetheless felt concerned for his safety and kept his hand on his cell phone until he got in his car, feeling that he may need to quickly dial 911.

On July 23, 2008, Kepple filed a complaint with the New London police department. The defendant was arrested and, on May 15, 2009, after a jury trial, was found guilty of threatening in the second degree in violation of § 53a-62 (a) (3) and breach of the peace in the second degree in violation of § 53a-181 (a) (3). On May 20, 2009, the defendant was sentenced to a total effective term of eighteen months imprisonment, execution suspended after 150 days, followed by two years of probation. This appeal followed.

The defendant claims that there was insufficient evidence to establish that his statements to Kepple constituted "true threats" as required for conviction under

§§ 53a-62 (a) (3) and 53a-181 (a) (3), rather than consti-tutionally protected speech.[4] We begin by setting forth our standard of review. "The standard of review we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumu-lative force of the evidence established guilt beyond a reasonable doubt. . . . In [State v.] DeLoreto, [265 Conn. 145, 827 A.2d 671 (2003)] however, [our Supreme Court] explained that [t]his [c]ourt's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across the line between speech unconditionally guaranteed and speech which may legitimately be regulated. . . . In cases [in which] that line must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the [f]irst [a]mendment . . . protect. . . . We must [indepen-dently examine] the whole record . . . so as to assure ourselves that the judgment does not constitute a for-bidden intrusion on the field of free expression. . . .

---

[4] After the state rested, the defendant made an oral motion for a judgment of acquittal on the ground that the evidence was insufficient to establish that his speech was not protected by the first amendment. The court denied the motion. Subsequently, the defendant filed a written request to charge, requesting that the court instruct the jury on the definition of "threat" and "threaten," as used in §§ 53a-62 (a) (3) and 53a-181 (a) (3), in accordance with the meaning of "true threats" as set forth in State v. DeLoreto, supra, 265 Conn. 145. The court granted the request, and the jury properly was instructed on the definition of "true threats."

*New York Times Co.* v. *Sullivan,* 376 U.S. 254, 285, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). [Our Supreme Court] . . . reiterated this de novo scope of review in free speech claims in *DiMartino* v. *Richens,* 263 Conn. 639, 661–62, 822 A.2d 205 (2003) . . . .'' (Citation omitted; internal quotation marks omitted.) *State* v. *Cook,* 287 Conn. 237, 254–55, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). ''Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses . . . the reviewing court must examine for [itself] the statements in issue and the circumstances under which they were made'' to determine if they are protected by the first amendment. (Citation omitted; internal quotation marks omitted.) *Harte-Hanks Communications, Inc.* v. *Connaughton,* 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989).

''The First Amendment, applicable to the States through the Fourteenth Amendment, provides that Congress shall make no law . . . abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the First Amendment ordinarily denies a State the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence. . . . The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech. . . .

''The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the Constitution. . . . The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such

slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 153–54.

So-called "true threats" are among the limited areas of speech which properly may be restricted without violating the protections of the first amendment. "True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . . *Virginia* v. *Black*, 538 U.S. 343, 359–60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003). . . .

"[A]s expansive as the first amendment's conception of social and political discourse may be, threats made with specific intent to injure and focused on a particular individual easily fall into that category of speech deserving no first amendment protection. . . . Thus, we must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected. . . .

"In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . A true

threat, where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment. . . . Moreover, [a]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." (Citations omitted; internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 153–56.

After a thorough and independent review of the statements and the circumstances under which they were made, we conclude that the defendant's statements to Kepple constituted true threats and as such were not protected by the first amendment. In light of the circumstances, a reasonable speaker would foresee that the statements, "[m]ore of what happened to your son is going to happen to you," and, "I'm going to be there to watch it happen," when spoken to a listener whose son had suffered serious and life-altering physical injuries, would cause the listener to believe that he will be subjected to physical violence upon his person. A reasonable speaker would foresee that Kepple would interpret these words to mean that the defendant was going to take a series of actions that would culminate with the defendant "be[ing] there to watch it happen" when Kepple suffered severe physical injuries similar to those that were suffered by his son.[5]

---

[5] The dissent asks whether we have concluded "that the defendant was threatening that he would cause Kepple to suffer an intracranial hemorrhage? Or to experience a car accident, presumably caused by the defendant's sabotaging of the vehicle? Or some other sort of physical harm?" We do not make any conclusions about the specific means by which the defendant threatened to harm Kepple or the exact type of physical harm that he threatened to inflict. We do not believe that any such conclusions are necessary to our resolution of this appeal. Rather, we limit our inquiry to determining whether a reasonable speaker would foresee that the statements, "More of what happened to your son is going to happen to you," and, "I'm going to be there to watch it happen," when spoken to a listener whose son had suffered severe life-altering physical injuries, would be interpreted by the listener as a serious expression of intent to harm or assault. We answer that question in the affirmative. The fact that the listener is left to speculate

The defendant contends that his statements cannot be considered true threats because they were not as direct as those statements that this court and our Supreme Court have held to be true threats in prior cases. See *State* v. *Cook*, supra, 287 Conn. 255 (holding that " '[t]his [table leg] is for you if you bother me anymore' " was true threat); *State* v. *DeLoreto*, supra, 265 Conn. 145 (holding that "I'll kick your ass"; "I'm going to kick your ass, punk"; "Come on, right now"; and, "I'm going to kick your ass," constituted true threats [internal quotation marks omitted]); *State* v. *Gaymon*, 96 Conn. App. 244, 899 A.2d 715 (holding that " 'I'm going to kick your fucking ass' " was true threat), cert. denied, 280 Conn. 906, 907 A.2d 92 (2006). We do not agree with the defendant's contention that his decision to threaten Kepple by referencing Kepple's son's tragedy, rather than overtly describing the injuries he would witness Kepple suffer, removes his statement from the realm of true threats. A reasonable speaker would nonetheless foresee that Kepple would interpret the statements as a serious expression of an intention to harm or assault.

The entire factual context surrounding the defendant's statements, including the reaction of listeners, supports our conclusion that the defendant's statements were true threats, and not a mere joke or hyperbole. The defendant's statements were a specific threat, directed at a specific individual to whom the defendant

as to the exact type of serious life-altering physical injuries the speaker threatened to cause and the specific means by which that harm would be inflicted does not remove the statements from the realm of true threats. Just as the statement, "I'm going to kill you," can constitute a true threat despite the fact that the speaker did not specify which of the myriad of possible ways that harm would be inflicted; see *State* v. *Cook*, supra, 287 Conn. 237; *State* v. *DeLoreto*, supra, 265 Conn. 145; the defendant's statements to Kepple are true threats despite the fact that the defendant chose not to specify the exact type of physical harm he was threatening or the manner with which it would be inflicted.

was speaking. The defendant followed Kepple and Glidden out of the courtroom after a hearing where, due to what the defendant perceived to be Kepple's decision to seek fines, the defendant would be losing a substantial amount of money. After directing obscenities toward Kepple, the defendant, who appeared to be enraged, made his statements directly to Kepple. Thus, the statements were made by a visibly angry speaker who had just lost a legal dispute, which would cost him a significant amount of money, directly to a listener who was the focus of the speaker's anger and was, in no small part, responsible for the defendant's loss. As such, the factual context surrounding the making of the statements indicates that a reasonable speaker would foresee that the statements would be perceived as a serious expression of an intention to harm, rather than a mere joke or hyperbole.

The defendant claims that Kepple's reaction to the defendant's statements, including Kepple's reply, "[b]ut who has got your $25,000, bitch?" and the fact that he did not immediately report the incident to police, indicates that he did not genuinely feel threatened. In light of those facts, the defendant claims that the reaction of listeners indicates that his statements were not true threats. We do not agree. First, the defendant's argument is contrary to the clear precedent of our Supreme Court, holding that such evidence does not preclude a finding that statements constitute true threats. See *State* v. *Cook*, supra, 287 Conn. 255 (holding that defendant's statements were true threats despite noting that "[i]t is true . . . that the [victim's] reaction to the defendant's conduct suggests that he was not genuinely concerned for his safety"). Moreover, Kepple's decision not to file a complaint until two days after the incident does not indicate that he did not take the defendant's statements seriously. Kepple specifically testified that he waited before filing a complaint

because he and his wife were struggling to decide the best course of action due to their fear that filing a complaint would anger the defendant further and put their family at a greater risk. Given the circumstances, such a course of action was reasonable and does not detract from our conclusion. The fact that Kepple did not feel that he needed to contact the police immediately does not indicate that the defendant's statements could not reasonably be perceived as true threats. See *State* v. *DeLoreto*, supra, 265 Conn. 158 ("[i]mminence . . . is not a requirement under the true threats doctrine").

Moreover, contrary to the defendant's assertion, there was ample evidence in the record to demonstrate that the reaction of the listeners indicated that they had, in fact, perceived the defendant's statements as true threats. Specifically, immediately after hearing the defendant's statements, Glidden stated to Kepple: "I think he just threatened you." Additionally, Kepple testified that he believed the situation would escalate quickly if he did not promptly leave the scene and that he was "shocked," "scared" and "terrified." Thus, this is not a situation where the factual circumstances and the reactions of the listeners indicate that the defendant's statements were a mere joke or hyperbole. Compare *Watts* v. *United States*, 394 U.S. 705, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (alleged threats found to be constitutionally protected political hyperbole when spoken at political rally to crowd of listeners who laughed in response to hearing statements).[6] Rather,

---

[6] The dissent contends that the statement in *Watts* v. *United States*, supra, 394 U.S. 705, was "significantly more threatening than the language at issue in this case." Respectfully, we conclude that *Watts* is distinguishable from the present case, and we do not agree that, considering their context, the statements in *Watts* were "significantly more threatening" than those in the present case. Given both the statements themselves and the context in which they were spoken, the statements in *Watts* were significantly less threatening than the defendant's statements. As the dissent notes, the defendant in *Watts* was arrested for stating: "*If* they ever make me carry a rifle the first man I *want* to get in my sights is L.B.J." (Emphasis added; internal

the content of the defendant's statements, the factual context in which they were made and the reaction of the listeners indicate that a reasonable speaker would foresee that the defendant's statements would cause the listener to believe he would be subjected to physical violence. Thus, we conclude that the evidence was sufficient for the jury to find that the defendant's statements constituted true threats that were not protected by the first amendment.

The judgment is affirmed.

In this opinion ALVORD, J., concurred.

LAVINE, J., dissenting. As the majority notes, speech that communicates a "true threat" is not protected, nor should it be, because it has no communicative value and involves no exchange of ideas. Given highly publicized

---

quotation marks omitted.) *Watts* v. *United States*, supra, 706. First, the statements are, on their face, less threatening than the defendant's statements. The statements in *Watts* were conditional and expressed only what the defendant wanted to do, not what he would do. The United States Supreme Court stated that the "expressly conditional nature" of the statements was one of the factors that indicated that they were not true threats. Id., 708. Conversely, in the present case, the defendant's statements were not conditional, and contrary to the dissent's interpretation of the statements, did not express what the defendant wanted to happen but rather what would happen. Second, unlike the statements in the present case, the context of the statements in *Watts* strongly supported the conclusion that they were political hyperbole. The statements in *Watts* were spoken at a political rally. Id. The statements were not spoken to the subject of the threat but rather to a group of other rallygoers who laughed in response to hearing the statements. Id., 707. Thus, the statements and context in *Watts* stand in stark contrast to those in the present case. Here, the defendant's statements were spoken directly to the subject of the threat after the defendant followed him out of court appearing "hot" and "upset." The listeners did not respond with laughter to the defendant's statements. Rather, Kepple indicated that he was "shocked," "scared" and "terrified." Glidden testified that he thought the defendant had just threatened Kepple and that he kept his cell phone in his hand, fearing he would need to dial 911 quickly. Thus, *Watts* v. *United States*, supra, 705, supports our conclusion that the defendant's statements were true threats, not protected speech.

attacks on both public figures and private citizens, and the pervasiveness of violence in our society, protecting people from physical harm—as well as the *fear* of physical harm—is an issue of urgent importance. The invective used by the defendant in this case, Stephen J. Krijger, referencing Nicholas Kepple's injured son, is particularly offensive and outrageous. But all of this does not minimize the need to analyze dispassionately, and scrupulously, the precise language used and circumstances present when criminal prosecution is based on words. I accept the majority's recitation of the facts but not the conclusions it draws from them. Because I believe that the majority opinion wrongly concludes that the defendant communicated a "true threat," I respectfully dissent.

Speech can be caustic, crude, venomous or vicious without conveying a serious expression of intent to physically harm another. The question in this case is not whether the defendant's words were reprehensible, which they clearly were; or cruel, which they just as assuredly were; or whether they were calculated to cause psychic harm, which they unquestionably were; but whether they were *criminal.* Analysis of the words used, and the context in which they were uttered, persuades me that the defendant's fulminations amounted to a spontaneous, angry outburst, which, offensive as it was, did not constitute a "true threat" under our law.

I begin by reiterating what is, and what is not, a "true threat." A "true threat" is more than a vaguely menacing statement or hyperbole or venting. As the majority notes, the United States Supreme Court made it clear in *Virginia* v. *Black,* 538 U.S. 343, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003), that "[t]rue threats encompass those statements where the speaker means to communicate a *serious expression* of an intent to commit an *act of unlawful violence* to a particular individual or

group of individuals."[1] (Emphasis added; internal quotation marks omitted.) Id., 359.

"In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person *would foresee* that the statement *would* be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . A true threat, where a reasonable person *would* foresee that the listener *will believe* he will be subjected to physical violence upon his person, is unprotected by the first amendment." (Emphasis added; internal quotation marks omitted.) *State* v. *DeLoreto*, 265 Conn. 145, 156, 827 A.2d 671 (2003). "The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (Internal quotation marks omitted.) *State* v. *Cook*, 287 Conn. 237, 247, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008), citing *Virginia* v. *Black*, supra, 538 U.S. 358–60.

Of course, words carry various shades of meaning depending on how they are uttered and used, and a threat can be implicit as well as explicit. But words such as those used by the defendant must be interpreted contextually "against the background of a profound national commitment to the principle that debate on

---

[1] For in-depth discussions of the law relating to threats and free speech, see generally J. Elrod, "Expressive Activity, True Threats, and the First Amendment," 36 Conn. L. Rev. 541 (2004); J. Martin, "Deconstructing 'Constructive Threats': Classification and Analysis of Threatening Speech After Watts and Planned Parenthood," 31 St. Mary's L.J. 751 (2000); and G. Blakey & B. Murray, "Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law," 2002 BYU L. Rev. 829 (2002).

public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times* v. *Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

In cases implicating free expression, appellate courts have a heightened duty to ensure that the free expression of ideas, even noxious ones, is fully protected. "Whether a statement constitutes a true threat . . . prohibited by [General Statutes] § 53a-181 (a) (3) is a question of law subject to de novo review." *State* v. *Gaymon*, 96 Conn. App. 244, 248, 899 A.2d 715, cert. denied, 280 Conn. 906, 907 A.2d 92 (2006). "Whether language constitutes a true threat is an issue of fact for the trier of fact in the first instance. However . . . a rule of independent appellate review applies in First Amendment speech cases." (Citations omitted.) *State* v. *Johnston*, 156 Wn. 2d 355, 365, 127 P.3d 707 (2006). This is not because of the intrinsic value of speech such as that uttered by the defendant, but because history teaches us the dangers involved when government limits free expression. Such review requires the court to undertake "an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." (Internal quotation marks omitted.) *DiMartino* v. *Richens*, 263 Conn. 639, 662, 822 A.2d 205 (2003), quoting *New York Times Co.* v. *Sullivan*, supra, 376 U.S. 285. In cases similar to this one, our Supreme Court has made clear that "the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 153.

State and federal cases have looked to a number of factors in determining whether words used constituted a "true threat," or something else worthy of first amendment protection.[2] Analysis of these factors persuades me that defendant's words did not constitute a "true threat."

I

## THE WORDS USED WERE VAGUE AND AMBIGUOUS, NOT EXPLICIT AND DEFINITE

The statement, "[m]ore of what happened to your son is going to happen to you," followed by, "I'm going to be there to watch it happen," does not, in my view, convey a "true threat." Quite clearly, it does not contain an explicit threat of any kind. Nonetheless, the majority asserts that these statements, testified to by Kepple, the town attorney for Waterford, would cause a reasonable person to foresee that they would be interpreted by Kepple as "a serious expression of intent to harm or assault." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 156. The majority accepts the state's contention that the words, "I'm going to be there to watch it happen," support the argument that the defendant himself would be the person *causing* the accident and/or injury. The majority concludes that these statements are implicitly threatening.

I agree with the majority that in the absence of any contrary indication, for purposes of appellate review, it must be assumed that the jury credited the above iteration of the words used by the defendant, the more

---

[2] See, e.g., *United States* v. *Khorrami*, 895 F.2d 1186, 1192–93 (7th Cir.) (among multiple factors judge may review are words themselves, time of making alleged threat, maker's manner of speaking, format of alleged threat, [spoken or written], tone of voice of speaker, prior or current relationship— if any—between maker and target and any other relevant facts that provide more complete overview of circumstances in which threatening statement made), cert. denied, 498 U.S. 986, 111 S. Ct. 522, 112 L. Ed. 2d 533 (1990).

threatening of the two versions that are recounted in the evidence. At trial, however, Kepple and Michael Glidden, a zoning enforcement officer for the town of Waterford, provided two very different recountings of what the defendant said, one of which was significantly less bellicose than the other.

Kepple testified that when he, Glidden and the defendant walked out of the courthouse onto the adjacent plaza, the defendant said, "[m]ore of what happened to your son is going to happen to you," and then said, "I'm going to be there to watch it happen." Kepple testified: "His face was red. You could see spit on his—on the corner of his mouth. He was hot. He was upset." Glidden, the only witness to the exchange other than Kepple and the defendant, testified that the defendant instead stated in relevant part, "I hope misfortune happens to you and your family just like what occurred to your son, and I'll be there to witness it." On cross-examination, Glidden affirmed that the defendant had used the words "wish or hope" when discussing the harm he wanted to befall Kepple. Additionally, Glidden testified that he wrote notes of the incident two to three hours after it occurred. Glidden was asked to read out loud a paragraph of the notes, marked as exhibit C, at trial, and did so. The paragraph read as follows: "Upon arriving outside the court house, we were confronted by [the defendant]. He began calling Nick Kepple a liar and a piece of shit. Another verbal exchange began then [the defendant] told Attorney Kepple, that he [the defendant] wished harm and misfortune upon him and his family just like what happened to Mr. Kepple's son. [The defendant] then told us that he hoped that he would be present when such misfortune befalls the Kepples."

Although a "true threat" need not convey an intention to act imminently; State v. DeLoreto, supra, 265 Conn. 159; even accepting Kepple's version of what was said,

the statements attributed to the defendant are ambiguous, and, more importantly, subject to varying interpretations. As noted, the majority contends that the statement, "I'm going to be there to watch it happen," should be understood to mean that the defendant is asserting that he will be the one who will *cause* "[m]ore of what happened to your son . . . to . . . happen to you." Apparently, the majority believes this open-ended statement should be construed as a threat to injure the defendant, presumably by rendering his car unsafe. I find this interpretation problematic.[3] Tragically, several years before the incident at issue, Kepple's son suffered a spontaneous intracranial hemorrhage and then, after blacking out, was involved in a car crash. Does the majority conclude that the defendant was threatening that he would cause Kepple to suffer an intracranial hemorrhage? Or to experience a car accident, presumably caused by the defendant's sabotaging of the vehicle? Or some other sort of physical harm? We are left to speculate as to precisely what he meant.

I conclude that the defendant's words were instead the rough, inarticulate equivalent of stating, "I hope harm befalls you, and I hope I am there to witness it," or, "I hope I am there to see bad things happen to you." I read the statement, "I'm going to be there to watch it happen," to mean, roughly, "I hope I have the opportunity to watch you suffer," rather than, "I intend to *make* you suffer." It simply requires too much surmise, too much reading into the statements, and too much interpretation to conclude beyond a reasonable doubt that a reasonable person would view this misguided vitriol as a serious threat to do physical violence under all the circumstances present.

---

[3] Kepple did, however, testify that he took the defendant's words to be a threat to him and his family, and a threat to intimidate him and curb him from doing his job. He also testified that he took the defendant's words to mean that he was going to do things that led to a car accident.

I agree that a reasonable person conceivably *could* purport to "foresee that the listener will believe he will be subjected to physical violence upon his person"; (internal quotation marks omitted) *State* v. *DeLoreto,* supra, 265 Conn. 156; upon evaluating the defendant's conduct and hearing the defendant's words. But the test set out in *Virginia* v. *Black,* supra, 538 U.S. 343, and adopted in controlling Connecticut cases; see, e.g., *State* v. *DeLoreto,* supra, 145; requires not that the listener *could* foresee that the listener will believe he will be subjected to physical violence, but rather that a reasonable person *would* foresee that the listener will believe he will be subjected to physical violence. Many ambiguous statements *could* be viewed as truly threatening, but the requirement that a reasonable person *would* foresee a physically violent outcome requires that that outcome be more than a theoretical possibility. The difference between convicting someone of threatening because words *could* be viewed as truly threatening, and convicting someone because the words *would* be viewed as threatening, is the difference between providing adequate breathing room for free expression, even noxious free expression with little communicative value, and not.

## II

## CONNECTICUT AND FEDERAL PRECEDENTS

Research has not produced a single Connecticut case in which someone has been convicted of threatening for such ambiguous words, which did not explicitly communicate a "true threat," in the absence of accompanying threatening conduct.[4] A brief, nonexhaustive

---

[4] Much of the federal case law on threatening relates to cases brought pursuant to 18 U.S.C. § 871 (a), which prohibits "knowingly and willfully . . . [making] any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States," or 18 U.S.C. § 875 (c), which prohibits the transmission of threats in interstate commerce. Various United States Circuit Courts of Appeals have adopted different approaches to determining what the elements of the offense are and what mental state must be proven.

review of *DeLoreto* and subsequent cases places into proper context the language used in this case. Dante DeLoreto was convicted of two counts of breach of the peace in the second degree based on two incidents.[5] Id., 147–48. The first incident occurred on June 9, 2000. Id., 148. Robert Labonte, a Wethersfield police officer, was jogging when a car drove slowly beside him. Id. DeLoreto was driving the car, and he lowered the window and stated, "Faggot, pig, I'll kick your ass." (Internal quotation marks omitted.) Id. DeLoreto then sped past the jogging officer and stopped his car in the middle of the road. Id. DeLoreto opened the car door, stating, "I'm going to kick your ass, punk . . . ." (Internal quotation marks omitted.) Id., 149. DeLoreto again sped past the officer, parked his car in the road, pumped his

---

In *United States* v. *Kelner*, 534 F.2d 1020 (2d Cir.), cert. denied, 429 U.S. 1022, 97 S. Ct. 639, 50 L. Ed. 2d 623 (1976), for example, the court concluded, in a prosecution pursuant to 18 U.S.C. § 875 (c) for making threatening statements against Yasser Arafat; id.; that the threat must be "unequivocal, unconditional, immediate, and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution . . . ." Id., 1027. But the *Kelner* court rejected the defendant's request for a ruling that the government would be required to prove the subjective intent to carry out the threat, rather than merely intending to threaten. Id., 1026–27.

In *United States* v. *Twine*, 853 F.2d 676 (9th Cir. 1988), the court held that a threat prosecution under 18 U.S.C. § 875 (c) requires a finding of specific intent. Id., 680–81. But a mens rea requirement of general intent was deemed sufficient in *United States* v. *Myers*, 104 F.3d 76, 81 (5th Cir.), cert. denied, 520 U.S. 1218, 117 S. Ct. 1709, 137 L. Ed. 2d 834 (1997). For a detailed analysis of the federal circuit courts of appeals' jurisprudence on "true threats," see G. Blakey & B. Murray, "Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law," 2002 BYU L. Rev. 829, 937–1010 (2002). The Court of Appeals for the Second Circuit, notably, has ruled that the question of whether a defendant's communication is a "true threat" is a threshold question of law for the court. See *United States* v. *Francis*, 164 F.3d 120, 123 n.4 (2d Cir. 1999).

[5] DeLoreto was convicted of violating § 53a-181 (a) (1), (3) and (5). Section 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property . . . ."

fists and stated, "I'm going to kick your ass." (Internal quotation marks omitted.) Id.

The second incident occurred on June 15, 2000, when Wethersfield police Sergeant Andrew Power entered a convenience store. Id. DeLoreto entered soon after. Id. Following an exchange of words, DeLoreto followed Power out of the store and stated: "I'm going to kick your punk ass." (Internal quotation marks omitted.) Id., 150. When Power got out of his cruiser to pick up the newspaper he had purchased off the newspaper stand at the store, the defendant kept yelling at him. Id. The threats made in *DeLoreto* were explicit and unmistakable.

In *State* v. *Gaymon*, supra, 96 Conn. App. 244, a probation officer and two Bridgeport police officers went to Gregory Gaymon's house to arrest him on a charge of probation violation. Id., 245. After being handcuffed, Gaymon told the probation officer, " 'I'm going to kick your fucking ass,' " and then spit in his face. Id. This court affirmed Gaymon's conviction of breach of the peace in the second degree in violation of § 53a-181 (a) (3). Id. In that case, an explicit threat was made, accompanied by assaultive conduct.

In *State* v. *Cook*, supra, 287 Conn. 237, Daniel Cook was convicted of carrying a dangerous weapon in violation of General Statutes §§ 53-206 and 53a-3,[6] stemming from an incident involving a tenant who lived in the

---

[6] General Statutes § 53-206 (a) provides in relevant part: "Any person who carries upon his or her person any BB. gun, blackjack, metal or brass knuckles, or any dirk knife, or any switch knife, or any knife having an automatic spring release device . . . any police baton or nightstick, or any martial arts weapon or electronic defense weapon . . . or any other dangerous or deadly weapon or instrument, shall be fined not more than five hundred dollars or imprisoned not more than three years or both. . . ."

General Statutes § 53a-3 (7) provides: " 'Dangerous instrument' means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ."

same building who had started a petition drive to have Cook evicted. Id., 239–40. Cook went to the victim's floor waving a table leg, which, the victim testified, had a piece of metal sticking out of it. Id., 240. Cook said, in response to a statement by the victim, that "[t]his is for you if you bother me anymore." (Internal quotation marks omitted.) Id. That threat, while conditional, is more explicit than the threat made in this case and was accompanied by threatening conduct.

This court reversed Diana L. Moulton's conviction for breach of the peace in the second degree in violation of § 53a-181 (a) (3) and harassment in the second degree in violation of General Statutes § 53a-183 (a) (3)[7] in *State* v. *Moulton,* 120 Conn. App. 330, 332, 991 A.2d 728, cert. granted, 297 Conn. 916, 996 A.2d 278 (2010). Moulton, a United States Postal Service employee, had made reference to a recent incident in which a postal service employee in California had shot several workers at the postal facility where she worked. Id., 333. Moulton, who was unhappy about being placed on leave from her employment, stated to a supervisor during a telephone call: "[T]he shootings, you know, the shootings in California. I know why she did that. They are doing the same thing to me that they did to her, and I could do that, too." (Internal quotation marks omitted.) Id. This court reversed the conviction of both charges, concluding that the trial court had erred by not giving an instruction that Moulton could be convicted of breach of the peace only if her views constituted a "true threat" rather than mere puffery, bluster, jest or hyperbole. Id., 344.

In this case, there (1) is no explicit threat to do bodily harm, (2) is one confined outburst but no repeated

[7] General Statutes § 53a-183 (a) provides in relevant part: "A person is guilty of harassment in the second degree when . . . (3) with intent to harass, annoy or alarm another person, he makes a telephone call, whether or not a conversation ensues, in a manner likely to cause annoyance or alarm."

threatening words or conduct and (3) are no threatening actions or movements. Although the defendant did follow Kepple and Glidden out of the courthouse, there is nothing in the record to indicate that the defendant made threatening gestures of any kind.

## III

## THE CONTEXT

As one court has noted, "context is critical in a true threats case"; *Planned Parenthood of Columbia/Willamette, Inc.* v. *American Coalition of Life Activists*, 290 F.3d 1058, 1078 (2002), cert. denied, 539 U.S. 958, 123 S. Ct. 2637, 156 L. Ed. 2d 655 (2003); because "without context a burning cross or dead rat means nothing." Id., 1079. The incident in the present case occurred in a public place following a public event, and was directed at a town official. The defendant was angry and vented his outrage at Kepple in an egregiously inappropriate way. The statement was clearly unplanned, a spontaneous reaction to the upset and anger he felt following the court hearing. Spontaneous language can of course communicate a "true threat," but the fact that language is spontaneous is one relevant factor in evaluating whether the words in fact represent a "true threat," or something else.

When considering the context of speech, courts have found that other, more explicitly threatening language failed to constitute a "true threat." In *Watts* v. *United States*, 394 U.S. 705, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969), for example, Watts, eighteen years old, was present at a rally at the Washington Monument during the Vietnam War. Id., 706. He joined a small discussion group and stated: "They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to

get in my sights is L.B.J." (Internal quotation marks omitted.) Id. The defendant was charged under 18 U.S.C. § 871 (a); id., 705; which prohibits any person from "knowingly and willfully . . . [making] any threat to take the life of or to inflict bodily harm upon the President of the United States . . . ." Id., 705 n.*. In a per curiam decision, the United States Supreme Court reversed his conviction, stating as follows in relevant part that "a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech. . . . We do not believe that the kind of political hyperbole indulged in by [the] petitioner [can be considered to be a true 'threat']. For we must interpret the language Congress chose against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (Citations omitted.) Id., 707–708. The court focused its attention on the context of Watts' words, stating: "The language of the political arena, like the language used in labor disputes . . . is often vituperative, abusive, and inexact. We agree with the petitioner that his only offense here was 'a kind of very crude offensive method of stating a political opposition to the President.' Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise." Id., 708. The statement in *Watts*, while conditional, was significantly more threatening than the language at issue in this case.

*National Assn. for the Advancement of Colored People* v. *Claiborne Hardware Co.*, 458 U.S. 886, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982), is also instructive. In

this civil case, an injunction and damages were sought against the National Association for the Advancement of Colored People and Charles Evers, the field secretary of the National Association for the Advancement of Colored People in Mississippi, in connection with Evers' activities in support of a boycott of white merchants in Claiborne County, Mississippi. Id., 889–90. In the record was a finding that Evers had told an audience he was addressing that "any uncle toms who broke the boycott would have their necks broken by their own people." (Internal quotation marks omitted.) Id., 900 n.28. Reversing the judgment against Evers and the National Association for the Advancement of Colored People, Justice Stevens, writing for the majority, stated: "The emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech . . . . The lengthy addresses generally contained an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them. In the course of those pleas, strong language was used. . . . Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. . . . When such appeals do not incite lawless action, they must be regarded as protected speech." Id., 928.

## IV

### THE HISTORY BETWEEN THE DEFENDANT AND KEPPLE

Despite the fact that the defendant and the town had been involved in a long-standing dispute over a period of years,[8] Kepple testified that he and defendant had always gotten along well. Specifically, Kepple testified that the defendant "had never acted like he did that

---

[8] Kepple testified that the town had dealt with the defendant on zoning issues as early as 1995. Kepple said his own dealings with the defendant went back to 2000.

day outside the court building." During the forty or fifty times Kepple had been to the defendant's house, "he was always pleasant and cooperative in his demeanor. . . . [G]enerally, he was fine to deal with." The absence of any history of acrimony whatever suggests that the defendant's statements evidenced a spontaneous act of frustration rather than a true threat.

## V

## VICTIM'S RESPONSE

Kepple's immediate response to the defendant's statements was not fully consistent with someone who felt truly threatened. His immediate response was to be stunned by the verbal assault leveled at him, particularly because it included a reprehensible reference to his son, and to respond with angry words of his own. Kepple's response was more akin to "trash talk" than the response of someone who felt truly threatened. After the incident, Glidden commented to Kepple, "I think he just threatened you," but Kepple failed to concur with that assessment by stating that he felt threatened. Of course, Kepple had every right to mull over what had happened and discuss it with his wife and colleagues before acting. But he did not report the incident to a judicial marshal, or the police, immediately after the incident occurred. Approximately two days later, after discussing the matter with a law partner, a state's attorney and his wife, he filed a complaint.

## VI

## NO THREATENING ACTIONS, WORDS OR MOVEMENTS ACCOMPANIED THE STATEMENT

While the defendant did follow Kepple and Glidden out of the courthouse and swear at Kepple prior to uttering the words resulting in the defendant's arrest, nothing in the record indicates that he engaged in any

threatening conduct, thereby distinguishing this case from *Gaymon* and *Cook*. Furthermore, he did not brandish any weapons or make any gestures indicating that he intended to inflict physical harm on Kepple. This prosecution was based on pure speech.

## VII

## CONCLUSION

I repeat my belief that invoking the image of the victim's injured son was particularly reprehensible and would arouse the passions of any parent. But as noted, it must be determined whether a "reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault . . . ." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 265 Conn. 156. Under prevailing law, the words must be evaluated from the viewpoint of a reasonable person. But this test must not become a license to view words through the most threatening, or most offensive, lens. There is intrinsic tension between the strict application of this test and recognition that the First Amendment requires words to be evaluated within a framework that values free expression. Even when no clear political point is being made, as in *Watts*, criminalizing words that represent extemporaneous venting, or hyperbole, invites abuse by government and creates dangers of its own, including prosecution of citizens who are—however inappropriately—merely venting their frustration or anger. Moreover, while the need to provide protection to persons is of paramount importance given the many horrific acts of violence that society has witnessed, this need must not vitiate one of the most fundamental principles of our law— that criminal defendants be judged based on their acts, not unrelated acts performed by other people at other times.

Assuming that our Supreme Court reviews this case, it may want to consider whether the present test, articulated in *DeLoreto*, which focuses on what the speaker would foresee, and how the victim would be expected to understand the words spoken, should be modified or refined. One can, of course, take the visceral view that if a person is irresponsible enough to utter words that might reasonably be viewed as threatening, he or she should have to live with the consequences of his or her actions, including criminal prosecution. In matters implicating free expression, however, whatever legal test is utilized must be tailored to guarantee protection to the full range of expression.

In his concurring opinion in *Rogers* v. *United States*, 422 U.S. 35, 47–48, 95 S. Ct. 2091, 45 L. Ed. 2d 1 (1975), Justice Marshall discussed his concerns about how 18 U.S.C. § 871 was being construed. In *Rogers*, a thirty-four year old unemployed carpenter with a ten year history of alcoholism wandered into a coffee shop, became loud and obstreperous, and stated that he was Jesus Christ. Id., 41. He said he was opposed to President Richard Nixon going to China because the Chinese had a bomb that only he knew about, which might be used against this country. Id., 41–42. He announced that he was going to go to Washington to "whip Nixon's ass" or "kill him in order to save the United States," and, after police were summoned, made more threatening statements. (Internal quotation marks omitted.) Id., 42. A five count indictment was returned against him, and he was convicted on all counts of threatening the president. Id.

Justice Marshall, who was joined by Justice Douglas, concurred with the majority in affirming the conviction under prevailing law but stated his concerns about the legal tests used in such cases: "Plainly, threats may be costly and dangerous to society in a variety of ways, even when their authors have no intention whatever of

carrying them out. Like a threat to blow up a building, a serious threat on the President's life is enormously disruptive and involves substantial costs to the Government. A threat made with no present intention of carrying it out may still restrict the President's movements and require a reaction from those charged with protecting the President. Because § 871 was intended to prevent not simply attempts on the President's life, but also the harm associated with the threat itself, I believe that the statute should be construed to proscribe all threats that the speaker intends to be interpreted as expressions of an intent to kill or injure the President. This construction requires proof that the defendant intended to make a threatening statement, and that the statement he made was in fact threatening in nature. Under the objective construction by contrast, the defendant is subject to prosecution for any statement that might reasonably be interpreted as a threat, regardless of the speaker's intention. In essence, the objective interpretation embodies a negligence standard, charging the defendant with responsibility for the effect of his statements on his listeners. We have long been reluctant to infer that a negligence standard was intended in criminal statutes . . . [and] we should be particularly wary of adopting such a standard for a statute that regulates pure speech. . . .

"I would therefore interpret § 871 to require proof that the speaker intended his statement to be taken as a threat, even if he had no intention of actually carrying it out. The proof of intention would, of course, almost certainly turn on the circumstances under which the statement was made: if a call were made to the White House threatening an attempt on the President's life within an hour, for example, the caller might well be subject to punishment under the statute, even though he was calling from Los Angeles at the time and had neither the purpose nor the means to carry out the

threat. But to permit the jury to convict on no more than a showing that a reasonably prudent man would expect his hearers to take his threat seriously is to impose an unduly stringent standard in this sensitive area." (Citations omitted.) Id., 46–48.

I believe Justice Marshall's words are well worth considering in cases such as this, given the fact that the defendant did not make an explicit threat, made no threatening gestures, and that his statement was a spontaneous hyperbolic outburst. Requiring that the state prove that the defendant *intended* to make a threatening statement in cases of this variety would add additional modest, but meaningful, breathing room for protected speech. See, e.g., *State* v. *Indrisano*, 228 Conn. 795, 801, 640 A.2d 986 (1994) (gloss applied to General Statutes § 53a-182, disorderly conduct statute, to protect vague statutory language from constitutional attack). As explosive as the defendant's charged words were, under the circumstances, I conclude that they fell short of a serious expression of an intent to commit an unlawful act of physical violence. Protecting persons from true threats, while not unduly restricting free expression, is a difficult balancing act, but it is one the first amendment requires us to undertake. In this case, I conclude that the balance tips in favor of the defendant.

For all of the foregoing reasons, I respectfully dissent.