**UNITED STATES of America, Appellee Cross–Appellant,**

v.

**Abdel–Jabbor MALIK, Defendant–Appellant Cross–Appellee.**

**No. 4, Docket 92–1391, 92–1477.**

United States Court of Appeals, Second Circuit.

Argued Oct. 5, 1993.

Decided Feb. 7, 1994.

Roger S. Hayes, New York, NY, U.S. Attorney, Southern District of New York (Kerry A. Lawrence and Deirdre M. Daly, Asst. U.S. Attorneys), for Appellee, Cross–Appellant.

Abdel–Jabbor Malik, Pro Se, Wallkill, NY, Defendant–Appellant, Cross–Appellee.

Before: MINER, ALTIMARI, Circuit Judges, and ELFVIN,* Senior District Judge.

ELFVIN, Senior District Judge:

Defendant Abdel–Jabbor Malik appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Goettel, *J.*), after a jury trial convicting him of two counts of mailing a threatening communication, in violation of 18 U.S.C. § 876, and one count of threatening to assault a United States Judge with intent to impede, intimidate or interfere with such judge while engaged in the performance of official duties, in violation of 18 U.S.C. § 115(a)(1)(B). Among the numerous challenges raised by Malik, only two merit discussion—namely, (1) his insufficiency-of-the-evidence claim that the letters did not contain punishable threats and (2) his Fourth Amendment claim premised on an illegal seizure of papers from his prison cell. His remaining claims are patently meritless. In response, the prosecution cross-appeals from the sentence imposed upon Malik, challenging the district judge's granting of a downward departure and his refusal to make a multiple-count adjustment. For the reasons stated below, Malik's appeal will be denied, the prosecution's cross-appeal will be granted and the case will be remanded for resentencing in accordance with this opinion.

The criminal charges against Malik arise out of two letters. The first, dated Decem-

---

* Honorable John T. Elfvin, Senior United States District Court Judge of the Western District of New York, sitting by designation.

ber 21, 1989, was received in the chambers of Hon. Thomas P. Griesa, United States District Judge for the Southern District of New York, on December 26, 1989.[1] It was signed in the defendant's name. After complaining that the Clerk's Office of the court had been intentionally delaying the handling of cases brought by Malik, the enclosed document continued:

The Plaintiff move this here Court to cause an investigation with this Courthouse Clerks Office on why is they unjustifiably obstructing with the Plaintiff cases communicating with this Courts Judges unless this Court promptly intervene and insure these cases being processed in this Court then What the Court is telling the Plaintiff in his eyes is to deal with each of these defendants family and them physically upon his soon prison discharge than handle things by legal rules and guidelines which is know problem to the Plaintiff to handle with his Foe's of Jewish americans but the Plaintiff per fer to handle things legally than for the Court to push thoughts as physical personal revenge as a way to deal with the above defendants by injuring them or family members well if the Court is not suggest ing that means to the Plaintiff than the Plaintiff urge the Court to urge that the cases in the caption become Clerk Office Court processed.

Judge Griesa regarded the letter as a threat to the adversaries in Malik's lawsuits and their families and referred it to the United States Marshal's Service. For this letter, Malik was charged with and convicted of one count of mailing a threatening communication.

The second letter, dated September 3, 1990, was filed in the United States Court of Appeals for the Second Circuit on September 27, 1990. Testimony established that the letter was in Malik's handwriting. The letter requested the Clerk of the Court to submit the letter to the three Circuit Judges—namely, Judges George C. Pratt, J. Daniel Mahoney and John M. Walker, Jr.—who had re-

cently dismissed civil appeals filed by Malik. It read, in pertinent part,

I do not know what this Court deem it is but unless this Case reverse it self as is justl due than a White Folks favor to my person upon my prison soon release two White American richly having jews money of 20 thousand dollars will become taken from them for you Jewish Judges action of unfairness in this Court My criminal rap sheet is no joke I'm know in prison for a store holdup on blacks or a black and if you White American Jewish Judges wanna act racially motivated with justice in a double sided way dropping the "I"; "C" and "E" of the Word Justice apparently raising the word "Just" well then so become it Ii'll play likewise with you judges from a Koranic and Torooh perspective thats an eye for an eye and life for a life which means if just treatment is not actioned in this case if I can arranged sooner than upon soon prison discharge two-American Jewish rich person will become armed robbed of 20 thousand cash dollars in replace for my case. Right Courts rob me I rob Court citizen sounds reasonable to me and just as wrong as Court in handling this case at issue wrongly.

If my case had no merit I'ed have know objection to its dismissal treatment.

My case has merit so unless a just treatment is done by this Court with it in the name of principal of the case at issue two White American Jewish folks will become dealt with now take me lightly if the Court will an see won't justice become done even if you Judges never here of it. And in the next two weeks my person is gonna submit 5 lawsuits in the Northern District Court although legitimate I really do not have'ta do so but I will.

Call the Prison, F.B.I. Inspector General; Governor; Police Whoever my will shall become done whether this Court believe it or not thats up to Judges.

The letter continued to another page in large, stylized letters:

Pharoah and his clique

---

1. Enclosed with the brief covering letter transmitted to Judge Griesa was a "Motion to Compel," which embodied the threats.

Were intoxicated with pride of
race and pride of material civilization
and grievously oppressed the israelities
What Pharoah Wished Was To Crush
Them
Is That What You Folks
Trying to Do Me As And
My Cases
Beware Of All Actions
South Africanner Europeans

Judge Mahoney interpreted the letter to be a threat to the members of the panel and, after consulting with Judge Pratt, the presiding judge of the panel, referred the letter to James Fox, the Director of the New York Office of the Federal Bureau of Investigation. For this second letter, the defendant was charged with and convicted of one count of mailing a threatening communication and one count of threatening to assault a United States judge with intent to impede, intimidate or interfere with such judge while engaged in the performance of official duties.

In addition to the above, another and earlier letter has been attributed to Malik. The letter, signed in the defendant's name and dated December 4, 1989, was addressed to and received by Richard Wilson, the Supervisor of the *Pro Se* Litigation Unit for the United States District Court for the Southern District of New York, on December 13, 1989. The letter stated, in part, as follows:

[R]echeck you current records because I'm gonna return to society soon an if my cases is not strainght then a lot of Jewish people will become dealt with in the district Court so I demand that you officials straight out any bull with my cases . . .

\* \* \* \* \* \*

What I ask of you is to promptly reply to those motion requests on what the Court plans to do in sofar as case service so I won't have to unessary threaten the Court judges and execute my threat when I return to society soon very soon so try to rectify my case situation so all can stay handled humanely than other which is not my desired way at this time to handle things and people i.e. brutely.

Based on this letter, Malik was charged with one count of mailing a threatening communication but was acquitted thereof by the jury.

Malik challenges the sufficiency of the evidence to convict him of having mailed threatening letters in violation of 18 U.S.C. § 876, claiming principally that the letters did not contain threats within the meaning of the statute. Whether a given writing constitutes a threat is an issue of fact for the trial jury. *United States v. Lincoln,* 589 F.2d 379, 381–82 (8th Cir.1979). An absence of explicitly threatening language does not preclude the finding of a threat under section 876, *see United States v. Prochaska,* 222 F.2d 1 (7th Cir.), *cert. denied,* 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746 (1955), and, of course, a conditional threat—*e.g.,* "your money or your life"—is nonetheless a threat, *United States v. Schneider,* 910 F.2d 1569, 1570 (7th Cir.1990). The test is an objective one—namely, whether "an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury." *United States v. Maisonet,* 484 F.2d 1356, 1358 (4th Cir.1973), *cert. denied,* 415 U.S. 933, 94 S.Ct. 1447, 39 L.Ed.2d 491 (1974). In making this determination, proof of the effect of the alleged threat upon the addressee is highly relevant. *United States v. Davis,* 876 F.2d 71, 73 (9th Cir.) (per curiam), *cert. denied,* 493 U.S. 866, 110 S.Ct. 188, 107 L.Ed.2d 143 (1989).

Viewing the evidence herein in the light most favorable to the prosecution and crediting every inference that could have been drawn in its favor, as we must, we cannot say that no rational trier of fact could have found beyond a reasonable doubt a threat in the respective letters. In the first letter Malik made explicit references to violence against his adversaries in lawsuits and their family members—*i.e.,* "deal with each of these defendants family and them physically," "physical personal revenge" and "injuring them or family members"—and to the impending nature of such violence—to wit, "upon his soon prison discharge." Added to those references were the enigmatic overtone of the letter—*viz.,* "his Foe's of Jewish americans"—and, importantly, the fact that the recipient of the letter was sufficiently alarmed by the

letter to construe and treat it as a threat. In the second letter, again, direct attention to violence was called for—*viz.,* "two-American Jewish rich person will become armed robbed of 20 thousand cash dollars"—and in connection with the addressee judges—*viz.,* "Ii'll play likewise with you judges from a Koranic and Torooh perspective thats an eye for an eye and life for a life." Malik also brought to notice the immediacy—"upon my prison soon release"—and the seriousness of the threat—"My criminal rap sheet is no joke." The cryptic and menacing tenor of the letter was much heightened—*e.g.,* "What Pharoah Wished Was To Crush them./Is That What You Folks Trying To Do Me As And My Cases/Beware Of All Actions South Africanner Europeans"—and it was of no surprise that Judge Mahoney had regarded the letter as threatening the panel members, the reaction itself supplying further highly probative evidence.

■ Arguably, the alleged threats in this case were ambiguous. It has been observed that ambiguous letters, standing alone, cannot establish a predicate for violating section 876. *Martin v. United States,* 691 F.2d 1235, 1239 (8th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983); *United States v. Barcley,* 452 F.2d 930 (8th Cir.1971). However, as already noted, there was additional, substantial evidence—the most significant of which was the recipients' states of minds and their reactions—that could and did remove ambiguity by shedding light upon the contexts of the alleged threats. The instant case is thereby distinguished from *Barcley,* wherein a disgruntled client had written to his court-appointed appellate attorney, criticizing the attorney's performance and further stating: "In point of fact, as soon as I can get this case situated around in the position I want you are the first S.O.B. that will go, [the prosecutor] will next." *Id.* at 932. In evaluating the insufficiency-of-the-evidence challenge by Barcley, the court noted that "[w]here a communication contains language which is equally susceptible of two interpretations, one threatening and the other nonthreatening, the government carries the burden of presenting evidence serving to remove that ambiguity." *Id.* at 933. After

observing that the nature of the communication placed the letter within the purview of the First Amendment, the *Barcley* court stated, in upholding Barcley's challenge to the conviction, that the government had to "offer something more than the equivocal language present here" and noted specifically that neither of the purported targets of the alleged threat had "testified that he experienced fear upon reading the letter." *Id.* at 933–34. We find this lack of substantial contextual evidence to have been an essential factor in the *Barcley* holding. As stated in *United States v. Prochaska,* 222 F.2d at 2, "[w]ritten words or phrases take their character as threatening or harmless from the context in which they are used, measured by the common experience of the society in which they are published." Thus, rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render the statute powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat. Surely, an equivocal letter with equal chances of being interpreted innocuously or harmfully should not, in and of itself, convince a jury beyond a reasonable doubt that it is a threat. But once sufficient extrinsic evidence, capable of showing beyond a reasonable doubt that an ordinary and reasonable recipient familiar with the context of the letter would interpret it as a threat, has been adduced the trial court should submit the case to the jury.

■ Malik notes additionally that the letters were simply hyperbolic or rhetorical expressions of anger or discontent protected under the First Amendment, citing in support *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Therein an 18–year–old youth had been convicted of having knowingly and willfully threatened the President in violation of 18 U.S.C. § 871(a) when he stated during a public rally,

"They always holler at us to get an education. And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday

coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706, 89 S.Ct. at 1401.

The conviction was reversed and the entry of a judgment of acquittal ordered, the Court stating that the kind of political hyperbole indulged in by petitioner did not constitute a constitutionally punishable true threat. The Court noted that it did not see how the language could be interpreted as anything but "a kind of very crude offensive method of stating a political opposition to the President." *Id.* at 708, 89 S.Ct. at 1402. Absent such an unusual set of facts, however, existence *vel non* of a "true threat" is a question generally best left to a jury. *See United States v. Carrier,* 672 F.2d 300, 306 (2d Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). In the instant case, the jury was charged *inter alia* as follows:

A threat is a statement expressing an intention to inflict bodily harm to someone of such a nature as could reasonably induce fear as distinguished from idle, careless talk, exaggeration or something said in a joking manner. You must determine whether the threat was a true threat when judged in its context. A serious expression of intent to inflict injury and not merely a vehement or emotional expression of political opinion, hyperbole or arguments against government officials.

Among other things, you should consider whether on their face and in the circumstances in which they were made defendant's statements were so unequivical [sic], unconditional and specific as to convey to the recipient a gravity of purpose and apparent prospect of execution.

This charge substantially followed the language of *United States v. Kelner,* 534 F.2d 1020, 1024–28 (2d Cir.), *cert. denied,* 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976), in which this Court held, relative to 18 U.S.C. § 875, that "[s]o long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution," a statute punishing a threat may be applied constitutionally, *id.* at

1027, in order to further "the governmental interest of reducing the climate of violence to which true threats of injury necessarily contribute," *id.* at 1026,—an interest equally existent in the enforcement of section 876. Thus instructed on what constitutes a "true threat," the jury returned verdicts of guilty. It cannot be said that the jurors had taken leave of their rationality in so finding.

■ In addition, before turning to the government's cross-appeal, it is appropriate to comment briefly upon the defendant's Fourth Amendment challenge to a warrantless search of his prison cell conducted prior to the filing of the threatening communication charges. The allegedly illegal search was conducted by state corrections officers following an instruction by an F.B.I. agent. It is very questionable whether Malik had any expectation of privacy within his cell that would support a challenge to the search. *See Hudson v. Palmer,* 468 U.S. 517, 525–26, 104 S.Ct. 3194, 3199–3200, 82 L.Ed.2d 393 (1984); *Christman v. Skinner,* 468 F.2d 723, 726 (2d Cir.1972). In any event, the only evidence produced as the result of the search was the defendant's handwriting, the authenticity of which the defendant does not dispute. Such evidence could have been compelled to be produced without infringing upon the defendant's constitutional rights. *See United States v. Mara,* 410 U.S. 19, 21, 93 S.Ct. 774, 775, 35 L.Ed.2d 99 (1973); *Gilbert v. California,* 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953–54, 18 L.Ed.2d 1178 (1967). No unfair prejudice could have been suffered by Malik because of its introduction.

■ The prosecution cross-appeals, claiming that the district court erred in two respects in determining the defendant's sentence. Firstly, it challenges the granting of a two-level downward departure. The district judge explained that the departure was justified "because of the fact that [Malik] had no present ability to carry [the threat] out and he displayed his lack of ability to carry it out by putting his prison return address on the envelopes." The prosecutor claims that this was an improper basis. Departure from the Guidelines range is allowed only if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not ade-

quately taken into consideration by the Sentencing Commission in formulating the guidelines," 18 U.S.C. § 3553(b), or, in the Commission's language, only "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm," Guidelines Manual (Nov. 1993), Ch. 1, Pt. A—Introduction, Subpara. 4(b). We review *de novo* a district judge's legal conclusion that a given circumstance warrants departure. *United States v. Jagmohan*, 909 F.2d 61, 64 (2d Cir.1990). Here we find that the factors raised by the sentencing judge— namely, the defendant's inability to carry out the threats and his overt manifestation of that inability—were not of such a nature or of such a magnitude as to render the case atypical. The Sentencing Commission considered explicitly the existence *vel non* of a defendant's intent to carry out a threat, as manifested in the provision for a six-level enhancement for a defendant engaged in "any conduct evidencing an intent to carry out such threat" in section 2A6.1(b)(1) of the Guidelines. Included implicitly in the enhancement provision was a consideration that certain defendants would be unable to execute their threats. The sentencing judge here reasoned "that by [Malik's] giving his prison address the recipients were aware that he could not .carry out his threats, at least in the foreseeable future, thereby lessening the effects of the threats." However, the effect of the letter—*i.e.*, that the victims were given a sufficient basis for a temporary repose—is not a type of factor we find unsatisfactorily omitted from the Guidelines' considerations. Also, it is not at all such an unusual circumstance as can lead us to conclude that it has not been sufficiently factored into the Guidelines. To the extent the district judge's decision to depart may have reflected his disagreement with the jury's findings that the letters indeed constituted threats, such dissatisfaction cannot be a proper basis for a downward departure.

■ The prosecutor's second protest is against the district court's refusal to make a

multiple-count adjustment. The district judge completely discounted the convictions on the first two counts for the purpose of sentencing, stating that he did so "because I think the first two letters would never have been prosecuted had he not written the third." This rationale does not justify a disregard of the Sentencing Guidelines. Prosecutors are given wide discretion in their charging decisions and, although some may disagree—as the trial judge apparently did [2]—with the prosecutor's decision to prosecute on the letters, it is a decision which must be lived with. However well-grounded, a sentencing judge's frustration over the Guidelines' inherent rigidity, in and of itself, may not be a basis for casting aside pertinent provisions.

Accordingly, the defendant's convictions are *affirmed;* however the case is remanded for resentencing in accordance with this opinion.

---

**2.** At the beginning of the trial, Judge Goettel had observed that "this is borderline as to whether it   should be prosecuted."