******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* STEPHEN
JASON KRIJGER
(SC 18854)

Rogers, C. J., and Palmer, Zarella, McDonald and Espinosa, Js.

*Argued October 28, 2013—officially released September 2, 2014*

*Richard E. Condon, Jr.*, senior assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Sarah E. Steere*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. Following a hearing in Superior Court in the judicial district of New London concerning a long-standing zoning dispute between the defendant, Stephen Jason Krijger, and the town of Waterford (town), the defendant allegedly threatened Nicholas Kepple, the attorney who had represented the town at the hearing. Kepple notified the police of his confrontation with the defendant, who was arrested in connection with the incident. Thereafter, a jury found the defendant guilty of threatening in the second degree in violation of General Statutes § 53a-62 (a) (3)[1] and breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (3).[2] The trial court rendered judgment in accordance with the jury verdict, and the defendant appealed to the Appellate Court, claiming, inter alia, that the statements forming the basis of his conviction were protected by the first amendment to the United States constitution[3] because they were not real or true threats.[4] The Appellate Court, with one judge dissenting, rejected the defendant's claim; see *State* v. *Krijger*, 130 Conn. App. 470, 480, 484, 24 A.3d 42 (2011); see also id., 484–85 (*Lavine, J.*, dissenting) (concluding that defendant's statements did not constitute true threat); and we granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly determine that the evidence was sufficient to establish that the defendant's [conviction was] based [on] 'true threats' [that] were not protected speech under the first and fourteenth amendments to the United States constitution?" *State* v. *Krijger*, 302 Conn. 935, 28 A.3d 992 (2011). We conclude that, although the defendant's statements were offensive, they did not rise to the level of a true threat, and, consequently, they are entitled to the protection of the first amendment despite their inflammatory nature. Because the defendant's conviction cannot stand, we reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following procedural history and relevant facts, which the jury reasonably could have found. "The defendant's conviction arises out of statements that he made to . . . Kepple . . . outside the New London Superior Court on July 21, 2008. The defendant had been involved in a legal dispute with the town . . . since the mid-1990s due to various zoning violations relating to the [repeated] accumulation of debris on his property located at 18 Totoket Road in the Quaker Hill section of Waterford. In 1996, the town obtained a permanent injunction barring the defendant from violating the town's zoning regulations. Subsequently, the town obtained a court order granting it permission to enter the defendant's property to clean up the debris. The court [thereafter] granted the town a $17,000 lien in order to obtain payment from the defendant for the

cleanup costs. Kepple first became involved in the dispute [between the town and the defendant] in 2000 while representing the town during the defendant's appeal from the court's order granting the lien. . . . In 2003, the town foreclosed on the judgment lien and a lien [that it had obtained against the defendant's property] for unpaid taxes, and the defendant paid the full amount owed, $32,000, representing $25,000 for the cleanup fees and interest, and the remainder for [his] unpaid taxes.

"After paying the judgment lien, the defendant continued to violate the injunction from 2003 until 2008 . . . . The defendant's continued noncompliance resulted in multiple occasions [on which] both Kepple and the defendant appeared in court [to address motions for contempt that Kepple had filed against the defendant on behalf of the town]. In addition, Kepple and various zoning enforcement officers visited the defendant's property forty to fifty times in regard to his continued noncompliance . . . . Kepple testified that during his interactions with the defendant on these occasions, the defendant had always been 'pleasant and cooperative . . . .' [Michael Glidden, a zoning enforcement officer for the town, also testified that the defendant had always been 'very cordial' in his dealings with Glidden.]

"On July 21, 2008, the defendant, representing himself, appeared in court in response to Kepple's [motion seeking to have] . . . the court hold the defendant in contempt and fine him $150 per day for violations of the permanent injunction that occurred between September, 2007, and July, 2008. Kepple represented the town at the hearing, and . . . Glidden . . . testified regarding the zoning violations. [According to Kepple, the request for fines had upset the defendant because it was the defendant's belief that, if he brought his property into compliance, the town would not seek fines against him. Kepple testified that the defendant previously had stated that 'the town had promised him that so long as he complied,' the town would not 'seek the fines.'] At the conclusion of the hearing, the [court] did not make an immediate ruling but did indicate that [it] would be imposing fines on the defendant for violating the permanent injunction and failing to comply with the zoning regulations. . . .

"After the hearing, the defendant followed Kepple out of the courtroom, and the two men exchanged words. During this exchange, the defendant expressed his anger over the town's decision to seek fines and called Kepple a 'liar' and an 'asshole.' The defendant continued to follow Kepple and Glidden as they exited the courthouse. The defendant appeared angry; his face was red and there was [saliva] in the corner of his mouth. The defendant then stated to Kepple, '[m]ore of what happened to your son is going to happen to you,' to which Kepple replied, '[w]hat did you say?' . . . [T]he defen-

dant responded, 'I'm going to be there to watch it happen.' Kepple then responded by saying, '[y]ou piece of shit,' prompting the defendant to respond by calling Kepple a 'piece of shit.' Kepple then stated, '[b]ut who has got your $25,000, bitch?' "[5] (Citation omitted; footnote omitted.) *State* v. *Krijger*, supra, 130 Conn. App. 472–75. According to Kepple, the entire exchange lasted no more than "fifteen or twenty seconds."

"To place the defendant's statements in context, the following facts regarding Kepple's son are relevant. Kepple's only son had been injured in a car accident several years [earlier] while he was an officer with the [Groton Police Department]. The accident left [him] with broken ribs and broken teeth . . . severe brain damage resulting in an inability to use the right side of his body [and] cognitive and motor impairments.[6] The accident was highly publicized in local newspapers at the time it occurred. Additionally, [the local media] published [newspaper] articles after the accident reporting on the progress of Kepple's son's recovery. Kepple testified that he did not recall if he had ever discussed his son's accident with the defendant; however, he opined that it was entirely possible, given the years of interactions with the defendant and the fact that 'hundreds and hundreds' of people had asked Kepple about his son's condition in the years following the accident." (Footnote altered.) *State* v. *Krijger*, supra, 130 Conn. App. 475–76.

Following the incident at issue, Kepple and Glidden crossed the street to evade the defendant. See id., 476. Glidden testified that, as they were walking away, he said to Kepple: "I think he just threatened [you]," to which Kepple, in response, "sort of didn't say anything to [Glidden]; [he was] like, no, no, no, not really." On cross-examination, Glidden clarified that, "[a]t first, [Kepple's] reaction was, when I told him it was a threat, he just sort of shrugged it off."

In addition to Kepple's account of the defendant's statements, the jury also heard Glidden's alternative account of the words spoken by the defendant. Glidden characterized the exchange between the defendant and Kepple as a "heated conversation, an argument." According to Glidden, who was standing next to Kepple at the time, "[the defendant] said he wished ill will [on Kepple's] family and [Kepple] . . . and that [the defendant] would be . . . present to see that." Glidden also testified that, approximately two to three hours after the incident, he returned to his office and made written notes of his recollection of what had occurred. In these notes, which were admitted into evidence, Glidden wrote that the defendant stated to Kepple that he "wished harm and misfortune [on] him and his family, just like what happened to . . . Kepple's son." According to Glidden, the defendant also told Kepple that "he *hoped* that he would be present when such

misfortune befalls [the] Kepples." (Emphasis added.) Glidden also gave a statement to the police approximately two days after the incident, which was admitted into evidence. Glidden's statement "contained the following description of the defendant's comments: '[The defendant] told . . . Kepple that he wished harm and misfortune [on] him and his family just like what happened to . . . Kepple's son. [The defendant] then told . . . Kepple that he will be present when that happens.' Thus, the jury was presented with versions of the defendant's statements that differed in one relevant respect, namely, the presence or absence of precatory language." *State* v. *Krijger*, supra, 130 Conn. App. 474 n.1.

After Glidden and Kepple crossed the street, they spoke briefly about other matters and parted ways. Id., 476. Glidden testified that the defendant then followed him to his vehicle, which was located in a nearby parking garage. See id. At that time, the defendant apologized to Glidden for his outburst and said that he hoped it would not adversely affect their working relationship. Although the defendant was conciliatory, Glidden testified that he felt concerned for his safety and kept his hand on his cell phone until he got into his car, in the event that he needed to dial 9 1 1.

Two days later, Kepple filed a complaint with the New London Police Department. The defendant was subsequently arrested and charged with threatening in the second degree in violation of § 53a-62 (a) (2), which requires an intentional threat,[7] a second count of threatening in the second degree in violation of § 53a-62 (a) (3), which requires the defendant to act in reckless disregard of the risk of causing terror,[8] and breach of the peace in the second degree in violation of § 53a-181 (a) (3). The jury found the defendant not guilty of threatening in the second degree under § 53a-62 (a) (2) but guilty of the second count of threatening in the second degree under § 53a-62 (a) (3) and breach of the peace in the second degree. The trial court rendered judgment sentencing the defendant to a total effective term of eighteen months imprisonment, execution suspended after 150 days, and two years probation.

On appeal to the Appellate Court, the defendant claimed that "the evidence was insufficient to establish that the statements on which his conviction [of second degree threatening and breach of the peace] was based constituted 'true threats' . . . rather than protected speech under the first amendment . . . ." *State* v. *Krijger*, supra, 130 Conn. App. 472. The Appellate Court rejected this claim. Id., 480, 484. In doing so, the court noted that, for purposes of review, it must assume that the jury credited Kepple's account of the defendant's statements, rather than Glidden's, because Kepple's version was the "most damaging" and, therefore, "most consistent with the jury's guilty verdict." Id., 474 n.1. The court further noted that the legal standard govern-

ing the defendant's claim was an objective one, that is, whether a reasonable person in the defendant's position would have foreseen that Kepple would interpret the defendant's statements as a serious expression of the defendant's intention to cause Kepple physical harm, and that an alleged threat must be evaluated in light of its entire factual context, including the reaction of the listeners. Id., 479–80. Applying this standard, the court concluded that, "[i]n light of the circumstances, a reasonable speaker would [have] foresee[n] that the statements, '[m]ore of what happened to your son is going to happen to you,' and, 'I'm going to be there to watch it happen,' when spoken to a listener whose son had suffered serious and life-altering physical injuries, would cause the listener to believe that he will be subjected to physical violence  .  .  .  .  A reasonable speaker would [have] foresee[n] that Kepple would interpret these words to mean that the defendant was going to take a series of actions that would culminate with the defendant 'be[ing] there to watch it happen' when Kepple suffered severe physical injuries similar to those . . . suffered by his son." Id., 480.

In reaching its determination, the Appellate Court rejected the defendant's contention that "his statements cannot be considered true threats because they were not as direct as those statements that [this court and the Appellate Court] have held to be true threats in prior cases"; id., 481; and the defendant's contention that Kepple's immediate reaction, together with his two day delay in reporting the incident to the police, indicated that he did not genuinely feel threatened. Id., 482. With respect to the first contention, the Appellate Court concluded that the defendant's threats were sufficiently clear that a reasonable speaker would foresee that Kepple would take them seriously. See id., 481. With respect to the second contention, the court concluded that whether Kepple genuinely felt threatened by the defendant's statements was legally irrelevant under the objective standard applicable to the defendant's claim and that, in any event, there was ample evidence to support a finding that he did feel threatened. See id., 482–83.

Judge Lavine dissented from the majority opinion of the Appellate Court. He concluded that, although the defendant's statements were "reprehensible," "cruel" and "calculated to cause psychic harm"; id., 485 (*Lavine, J.*, dissenting); a reasonable speaker would not likely have foreseen that they would be perceived by Kepple as a serious expression of an intention to cause Kepple physical harm. See id., 490 (*Lavine, J.*, dissenting). Judge Lavine concluded, rather, that, when viewed in context and given their ordinary meaning, the defendant's words "amounted to a spontaneous, angry outburst, which, offensive as it was, did not constitute a 'true threat' under our law." Id., 485 (*Lavine, J.*, dissenting). In reaching his determination, Judge Lavine relied in part on Kepple's testimony that the

defendant's words were not accompanied by any threatening gestures and that, prior to the confrontation, Kepple had visited the defendant's home on approximately forty occasions, and the defendant always had been pleasant and cooperative. See id., 497–99 (*Lavine, J.,* dissenting). In Judge Lavine's view, the fact that the defendant never had exhibited any hostility toward Kepple in the past and was not physically threatening on the day in question supported the conclusion that the defendant's outburst was more consistent with "a spontaneous act of frustration rather than a true threat"; id., 498 (*Lavine, J.,* dissenting); "the rough inarticulate equivalent of stating, 'I hope harm befalls you, and I hope I am there to witness it . . . .' " Id., 490 (*Lavine, J.,* dissenting). Judge Lavine also noted that Kepple's immediate response to the defendant's statements was inconsistent with the behavior of someone who felt genuinely threatened by the defendant's remarks. Id., 498 (*Lavine, J.,* dissenting).

On appeal to this court following our granting of certification, the defendant urges us to adopt Judge Lavine's reasoning and to conclude that the evidence was insufficient to support a finding that the defendant's statements constituted true threats. The defendant also claims that the Appellate Court improperly relied solely on Kepple's version of the defendant's remarks instead of considering all of the testimony pertaining to those statements, including Glidden's more benign account of the incident. Although we reject the defendant's contention that the Appellate Court improperly relied only on Kepple's version of the defendant's statements, we agree that the evidence was insufficient to support his conviction even under Kepple's more damaging account of the remarks.

We first address the defendant's contention that the applicable standard of review requires us to consider Glidden's testimony in evaluating the sufficiency of the state's case. "Ordinarily, a jury or trial court's findings of fact are not to be overturned on appeal unless they are clearly erroneous. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Thus, we [generally] review the findings of fact made by the jury, in its verdict and specific interrogatories, and by the trial court in its judgment, for clear error.

"In certain first amendment contexts, however, appellate courts are bound to apply a de novo standard of review. . . . [In such cases], the inquiry into the protected status of . . . speech is one of law, not fact. . . . As such, an appellate court is compelled to examine for [itself] the . . . statements [at] issue and the circumstances under which they [were] made to [deter-

mine] whether . . . they . . . are of a character [that] the principles of the [f]irst [a]mendment . . . protect. . . . [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression. *New York Times Co.* v. *Sullivan,* [376 U.S. 254, 284–86, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)]. . . . This rule of independent review was forged in recognition that a [reviewing] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . Therefore, even though, ordinarily . . . [f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the rule of independent review." (Citations omitted; internal quotation marks omitted.) *DiMartino* v. *Richens,* 263 Conn. 639, 661–62, 822 A.2d 205 (2003); see also *Brown* v. *K.N.D. Corp.,* 205 Conn. 8, 13, 529 A.2d 1292 (1987) ("The purpose of independent review is to safeguard the right of free expression. . . . The function of the procedural scheme created by [the United States Supreme Court in a long line of first amendment cases] is obviously to require an independent second opinion when free speech is curtailed. These cases place the ultimate constitutional responsibility on appellate courts to render that second opinion in order to safeguard free expression." [Citations omitted; footnote omitted.]), overruled in part on other grounds by *DiMartino* v. *Richens,* supra, 639.

Contrary to the defendant's contention, the heightened scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue constituted a true threat, we accept all subsidiary credibility determinations and findings that are not clearly erroneous. See, e.g., *Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston,* 515 U.S. 557, 567, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995) ("[t]he requirement of independent appellate review . . . does not limit our deference to a trial court on matters of witness credibility" [citation omitted; internal quotation marks omitted]); *Harte-Hanks Communications, Inc.* v. *Connaughton,* 491 U.S. 657, 688, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) (although "the reviewing court must examine for [itself] the statements [at] issue and the circumstances under which they were made" to determine whether they are protected by first amendment, "credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor

of the witnesses" [internal quotation marks omitted]); *State* v. *Mullins*, 288 Conn. 345, 365, 952 A.2d 784 (2008) ("Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony." [Citation omitted.]). Thus, the Appellate Court properly assumed that the jury credited Kepple's version of the defendant's remarks, rather than Glidden's, because the jury could not have credited Glidden's version and also have found the defendant guilty of the charges in view of the fact that, according to Glidden, the defendant stated only that he *wished* Kepple would suffer the same fate as his son.

We therefore must consider the defendant's claim that the evidence was insufficient to convict him even under Kepple's version of the incident. To establish the defendant's violation of §§ 53a-62 (a) (3) and 53a-181 (a) (3) on the basis of his statements to Kepple, the state was required to prove beyond a reasonable doubt that those statements represented a true threat. "The [f]irst [a]mendment, applicable to the [s]tates through the [f]ourteenth [a]mendment, provides that Congress shall make no law . . . abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the [f]irst [a]mendment ordinarily denies a [s]tate the power to prohibit dissemination of social, economic and political doctrine [that] a vast majority of its citizens believes to be false and fraught with evil consequence. . . .

"The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution. . . . The [f]irst [a]mendment permits restrictions [on] the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .

"Thus, for example, a [s]tate may punish those words [that] by their very utterance inflict injury or tend to incite an immediate breach of the peace. . . . Furthermore, the constitutional guarantees of free speech and free press do not permit a [s]tate to forbid or proscribe advocacy of the use of force or of law violation except [when] such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. . . . And the [f]irst [a]mendment also permits a [s]tate to ban a true threat. . . .

"True threats encompass those statements [through

which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (Citations omitted; internal quotation marks omitted.) *Virginia* v. *Black*, 538 U.S. 343, 358–60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) (opinion announcing judgment).

"Thus, we must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected." *State* v. *DeLoreto*, 265 Conn. 145, 155, 827 A.2d 671 (2003). "In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . [A]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." (Citation omitted; internal quotation marks omitted.) *State* v. *Cook*, 287 Conn. 237, 249, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). Prosecution under a statute prohibiting threatening statements is constitutionally permissible "[as] long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution . . . ." (Internal quotation marks omitted.) *United States* v. *Malik*, 16 F.3d 45, 51 (2d Cir.), cert. denied, 513 U.S. 968, 115 S. Ct. 435, 130 L. Ed. 2d 347 (1994).

Two other considerations inform our analysis in determining whether the defendant's statements may be deemed to be a true threat. First, we perform that analysis "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.* v. *Sullivan*, supra, 376 U.S. 270; see also *R.A.V.* v. *St. Paul*, 505 U.S. 377, 414, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) (*White, J.*, concurring in the judgment) ("[t]he mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected"). Second, because the jury found the defendant not guilty of intentional threatening in the second

degree in violation of § 53a-62 (a) (2),[9] it necessarily rejected the state's contention that the defendant intended for his words to place Kepple in fear of bodily harm or death. The jury found, instead, that the defendant recklessly disregarded the risk that Kepple would perceive his remarks as threatening, in violation of § 53a-62 (a) (3), thereby causing Kepple inconvenience, annoyance or alarm. See General Statutes § 53a-181 (a). The jury's determination that the defendant did not intend to threaten Kepple is relevant to our analysis because, although "threats made with specific intent to injure . . . easily fall into that category of speech deserving no first amendment protection"; (internal quotation marks omitted) *State* v. *Cook*, supra, 287 Conn. 248; the risk of improperly criminalizing protected speech increases when the speaker does not intend for his words to convey a real threat.[10]

The starting point for our analysis is an examination of the statements at issue. As we have explained, the jury found that the defendant said to Kepple, "[m]ore of what happened to your son is going to happen to you," and "I'm going to be there to watch it happen." (Internal quotation marks omitted.) *State* v. *Krijger*, supra, 130 Conn. App. 474. Neither statement on its face communicates the type of explicit threat that this court or the Appellate Court previously has determined constituted a true threat for which the first amendment provides no protection. Cf. *State* v. *Cook*, supra, 287 Conn. 240, 255 (brandishing table leg with metal stick protruding from one end, defendant told victim, "[t]his is for you if you bother me anymore" [internal quotation marks omitted]); *State* v. *DeLoreto*, supra, 265 Conn. 149, 157 (defendant jumped out of car as victim was jogging past, ran toward victim and stated, "I'm going to kick your ass" [internal quotation marks omitted]); *State* v. *Gaymon*, 96 Conn. App. 244, 245, 249, 899 A.2d 715 (defendant spat in probation officer's face after stating, "I'm going to kick your fucking ass" [internal quotation marks omitted]), cert. denied, 280 Conn. 906, 907 A.2d 92 (2006). Nor does either statement explicitly convey the defendant's intention to personally undertake a course of action that would culminate in Kepple sustaining injuries similar to those sustained by his son. Of course, the "absence of explicitly threatening language does not preclude the finding of a threat . . . ." *United States* v. *Malik*, supra, 16 F.3d 49. Indeed, as the Second Circuit has observed, "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render [statutes proscribing true threats] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." Id., 50. Thus, "a determination of what a defendant actually said is just the beginning of a threats analysis. Even when words are threatening on their

face, careful attention must be paid to the context in which those statements are made to determine if the words may be objectively perceived as threatening." *In re S.W.*, 45 A.3d 151, 157 (D.C. 2012); see also *Planned Parenthood of the Columbia/Willamette, Inc.* v. *American Coalition of Life Activists*, 290 F.3d 1058, 1078–79 (9th Cir. 2002) ("context is critical in a true threats case . . . because without context, a burning cross or dead rat mean nothing" [citation omitted; footnotes omitted]), cert. denied, 539 U.S. 958, 123 S. Ct. 2637, 156 L. Ed. 2d 655 (2003).

An important factor to be considered in determining whether a facially ambiguous statement constitutes a true threat is the prior relationship between the parties. When the alleged threat is made in the context of an existing or increasingly hostile relationship, courts are more apt to conclude that an objectively reasonable speaker would expect that the statement would be perceived by the listener as a genuine threat. See, e.g., *Brewington* v. *State*, 7 N.E.3d 946, 970 (Ind. 2014) ("reasonable people necessarily take an ambiguous threat more seriously when it comes from someone who holds a [long-standing] grudge").

In contrast to those cases in which an alleged threat was made in the context of a relationship fraught with conflict, there was no history of animosity between the defendant and Kepple. To the contrary, according to Kepple, the defendant's remarks were made in the context of a long-standing working relationship that, despite its adversarial nature, always had been quite cordial and professional. Thus, this is not a case in which one's prior hostile acts or menacing behavior provided a clarifying lens through which to view an ambiguous threat; indeed, the record is devoid of such incriminating evidence. See *In re George T.*, 33 Cal. 4th 620, 637–38, 93 P.3d 1007, 16 Cal. Rptr. 3d 61 (2004) ("[u]nlike some cases that have turned on an examination of the surrounding circumstances given a communication's vagueness, incriminating circumstances in this case are noticeably lacking: [for example] there was no history of animosity or conflict between the [defendant and the recipients] . . . no threatening gestures or mannerisms accompanied the [alleged threat] . . . and no conduct suggested to [the recipients] that there was an immediate prospect of execution of [the] threat" [citations omitted]).

With respect to the immediate circumstances surrounding the alleged threat, it is undisputed that the defendant's statements were made on the heels of a contentious court hearing, at which, for the first time and apparently unbeknownst to the defendant, Kepple had decided to seek the imposition of approximately $6000 in fines to deter future noncompliance by the defendant. As Kepple explained, this news surprised and angered the defendant, who was under the impres-

sion that the town would follow its usual practice of not seeking fines as long as he brought his property into compliance prior to the hearing date. Indeed, according to Kepple, the defendant stated that the town had "promised him" that it would not seek any fines "[as] long as he complied . . . ." Kepple further testified that the defendant "was upset with the town and upset with me . . . because . . . he felt as though . . . I had broken my word that we wouldn't be seeking fines." It was against this backdrop, and immediately following the court hearing, while the defendant and Kepple were leaving the courthouse, that the defendant uttered the offending statements.

Kepple testified that, notwithstanding his own "not very civilized reaction" to the defendant's statements, he was "shocked" and "terrified" by what the defendant had said, and that his reaction "went from . . . shock to anger to fear." He also testified that, although "[he] wanted to try to give [the defendant] the benefit of the doubt, because [the defendant] hadn't been belligerent or hostile or aggressive" in their previous dealings, he believed that, if the defendant was "so evil that he [could] bring [Kepple's] son's tragedy into [the altercation] . . . [he could not] just leave that alone." Glidden, for his part, testified that Kepple appeared "thrown back" by the defendant's remarks, as well as "shocked" and "disgust[ed]." Glidden further testified, however, that, when he told Kepple that he thought that the defendant had just threatened him, Kepple shrugged it off and stated, "no, no, no, not really."

In light of this context and the reactions of both Kepple and Glidden, we recognize that it is possible to construe the defendant's statements as a threat. There is, however, a benign interpretation that we believe is more plausible, namely, that the defendant merely was expressing the view that "what goes around, comes around," and that, in the heat of the moment, the defendant felt, albeit irrationally, that Kepple, having reneged on his promise to the defendant, deserved to suffer a fate as terrible as his son's. Under the circumstances, the defendant's second statement, namely, that he would be there when Kepple suffered such a fate, can readily be understood to mean that the defendant looked forward to Kepple's suffering. Although crude and offensive, these sentiments are fully consistent with both the timing of the altercation—that is, right after the court hearing, when the defendant was still very agitated over what had occurred—and the angry, but not physically aggressive, manner in which they were communicated. We agree with the defendant, therefore, that his reference to the car accident involving Kepple's son is most reasonably construed as a low and hurtful blow leveled in frustration, and not as a serious expression of an intent to cause Kepple harm of the nature suffered by his son. This conclusion is supported by the absence of any evidence that the defendant ever

had threatened Kepple in the past, that he otherwise bore him any ill will, or that he was the type of person who was capable of carrying out such a threat.[11] See, e.g., *United States* v. *Parr*, 545 F.3d 491, 502 (7th Cir. 2008) ("[c]ontextual information—especially aspects of a defendant's background that have a bearing on whether his statements might reasonably be interpreted as a threat—is relevant" to threat analysis), cert. denied, 556 U.S. 1181, 129 S. Ct. 1984, 173 L. Ed. 2d 1083 (2009); *Doe* v. *Pulaski County Special School District*, 306 F.3d 616, 623 (8th Cir. 2002) (two factors courts should consider in evaluating alleged threat are "whether the speaker had a history of making threats against the person purportedly threatened" and "whether the recipient had a reason to believe that the speaker had a propensity to engage in violence"); *United States* v. *Sovie*, 122 F.3d 122, 125 (2d Cir. 1997) (defendant's history of physically abusing victim supported finding of true threat); *In re S.W.*, supra, 45 A.3d 155 ("words innocuous on their face—what might otherwise have been a civilized invitation to come outside—could be quite terrifying and objectively perceived as a threat in light of [the] defendant's statement three weeks prior that she would shoot the complainant if she did not repay a debt" [internal quotation marks omitted]).

This more innocuous interpretation of the defendant's words is also consistent with the fact that, immediately following his confrontation with Kepple, the defendant followed Glidden to the parking garage and apologized for his behavior, stating that he hoped it would not adversely affect their working relationship. The defendant's contrition immediately following the incident is decidedly at odds with the view that, just moments beforehand, he had communicated a serious threat to inflict grave bodily injury or death on Glidden's colleague.

Courts have held that, "[when] a communication contains language which is equally susceptible of two interpretations, one threatening, and the other nonthreatening, the government carries the burden of presenting evidence serving to remove that ambiguity. [In the absence of] such proof, the trial court must direct a verdict of acquittal." *United States* v. *Barcley*, 452 F.2d 930, 933 (8th Cir. 1971); see also *United States* v. *Malik*, supra, 16 F.3d 50 ("Surely, an equivocal [statement] with equal chances of being interpreted innocuously or harmfully should not, in and of itself, convince a jury beyond a reasonable doubt that it is a threat. But once sufficient extrinsic evidence, capable of showing beyond a reasonable doubt that an ordinary and reasonable recipient familiar with the context of the [statement] would interpret it as a threat, has been adduced, the trial court should submit the case to the jury."). On the basis of our independent review of the record, we cannot conclude that the state has met its burden of removing the ambiguity inherent in the defendant's

remarks. As Judge Lavine observed, "[i]t simply requires too much surmise, too much reading into the statements, and too much interpretation to conclude beyond a reasonable doubt that a reasonable person would view [the defendant's] misguided vitriol as a serious threat to do physical violence under all the circumstances present." *State* v. *Krijger*, supra, 130 Conn. App. 490 (*Lavine, J.*, dissenting). "The incident . . . occurred in a public place following a public event, and was directed at a town official. The defendant was angry and vented his outrage at Kepple in an egregiously inappropriate way. The statement was clearly unplanned, a spontaneous reaction to the upset and anger he felt following the court hearing. Spontaneous language can of course communicate a 'true threat,' but the fact that language is spontaneous is one relevant factor in evaluating whether the words in fact represent a 'true threat,' or something else." Id., 495 (*Lavine, J.*, dissenting). Because the state failed to establish that the defendant's statements were anything *other* than a spontaneous outburst, rooted in the defendant's anger and frustration, the evidence was insufficient to establish that they constituted a true threat.[12]

We acknowledge, as the state contends, that both Kepple and Glidden experienced fear upon being subjected to the defendant's offensive remarks. Although a recipient's reaction to an alleged threat is one factor to consider in evaluating whether a statement amounted to a true threat, the test we apply is ultimately an objective one. See, e.g., *In re S.W.*, supra, 45 A.3d 160 ("[A listener's] subjective response, although entirely understandable, does not change the objective calculus as to whether [the defendant] posed a threat . . . . [I]t can be expected [under certain circumstances] that [the listener's] sensitivities would be heightened. But every statement that causes a [listener] fear or painful memories is not a [true] threat; [the court's] interpretation of the law of criminal threats must leave some room for speech that is less than perfectly sensitive."); see also *New York ex rel. Spitzer* v. *Operation Rescue National*, 273 F.3d 184, 196 (2d Cir. 2001) (expressing concern that "excessive reliance on the reaction of recipients" could endanger first amendment protections). Under that test, the state must prove beyond a reasonable doubt that "a reasonable person *would* foresee that the statement *would be* interpreted . . . as a serious expression of intent to harm or assault." (Emphasis added; internal quotation marks omitted.) *State* v. *Cook*, supra, 287 Conn. 249.

We agree with Judge Lavine that, to ensure that only *serious* expressions of an intention to commit an act of unlawful violence are punished, as the first amendment requires, the state must do more than demonstrate that a statement *could* be interpreted as a threat. When, as in the present case, a statement is susceptible of varying interpretations, at least one of which is nonthreatening,

the proper standard to apply is whether an objective listener would readily interpret the statement as a real or true threat; nothing less is sufficient to safeguard the constitutional guarantee of freedom of expression. To meet this standard in the present case, the state was required to present evidence demonstrating that a reasonable listener, familiar with the entire factual context of the defendant's statements, would be highly likely to interpret them as communicating a genuine threat of violence rather than protected expression, however offensive or repugnant. As we explained, the state's evidence fell short of this mark, and, therefore, the defendant is entitled to a judgment of acquittal on both the second degree threatening and breach of the peace charges.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the trial court's judgment and to remand the case to the trial court with direction to render a judgment of acquittal.

In this opinion the other justices concurred.

[1] General Statutes § 53a-62 (a) provides in relevant part: "A person is guilty of threatening in the second degree when . . . (3) such person threatens to commit such crime of violence in reckless disregard of the risk of causing such terror."

[2] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (3) threatens to commit any crime against another person or such other person's property . . . ."

[3] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech . . . ."

The first amendment prohibition against laws abridging the freedom of speech is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. E.g., *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 489 n.1, 116 S. Ct. 1495, 134 L. Ed. 2d 711 (1996).

[4] As we discuss more fully hereinafter, a "true threat" is "a serious expression of an intent to commit an act of unlawful violence against another"; *State* v. *Cook*, 287 Conn. 237, 239, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008); and is not protected by the first amendment. See, e.g., id., 247.

[5] "Apparently, Kepple was referring to the $25,000 [that] the defendant previously had paid [to] the town for cleanup costs and interest." *State* v. *Krijger*, supra, 130 Conn. App. 475 n.2.

[6] "Kepple's son suffered a spontaneous intracranial hemorrhage while driving, causing him to black out and the car he was driving to hit a tree. The severe brain injuries were caused by the intracranial brain hemorrhage, not by the accident itself. The [media] covering the accident, however, presented the story in a manner that made it appear as though the accident caused all of [his] son's injuries." *State* v. *Krijger*, supra, 130 Conn. App. 475 n.3.

[7] General Statutes § 53a-62 (a) provides in relevant part: "A person is guilty of threatening in the second degree when . . . (2) such person threatens to commit any crime of violence *with the intent to terrorize another person* . . . ." (Emphasis added.)

[8] See footnote 1 of this opinion.

[9] See footnote 7 of this opinion.

[10] We note the present split of authority among the federal Circuit Courts of Appeals as to whether *Virginia* v. *Black*, supra, 538 U.S. 343, "altered or overruled the traditional objective test for true threats by requiring that the speaker subjectively intend to intimidate the recipient of the threat." *United States* v. *Turner*, 720 F.3d 411, 420 n.4 (2d Cir. 2013); see id. (recogniz-

ing split of authority but declining to decide whether *Black* overruled objective test in light of defendant's failure to raise issue), petition for cert. filed (U.S. March 14, 2014) (No. 13-1129). The divergence of opinion derives from the following statement by the court in *Black*: " 'True threats' encompass those statements [through which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . *Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where*[*by*] *a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.*" (Citations omitted; emphasis added.) *Virginia* v. *Black*, supra, 359–60 (opinion announcing judgment). Since *Black*, some courts have indicated that this language requires proof that the speaker subjectively intended to threaten the victim. See, e.g., *United States* v. *Parr*, 545 F.3d 491, 500 (7th Cir. 2008) (declining to decide issue but noting that objective test for true threat likely is "no longer tenable" after *Black*), cert. denied, 556 U.S. 1181, 129 S. Ct. 1984, 173 L. Ed. 2d 1083 (2009); *United States* v. *Magleby*, 420 F.3d 1136, 1139 (10th Cir. 2005) (subjective test supported by *Black*, but court did not reach first amendment challenge because claim was procedurally barred), cert. denied, 547 U.S. 1097, 126 S. Ct. 1879, 164 L. Ed. 2d 567 (2006); *United States* v. *Cassel*, 408 F.3d 622, 631 (9th Cir. 2005) (*Black*'s definition of true threat "embraces not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to threaten the victim" [emphasis omitted]); see also *Brewington* v. *State*, 7 N.E.3d 946, 964 (Ind. 2014) (subjective test "is consistent with *Black*'s focus on 'whether a particular [communication] is intended to intimidate' . . . and consistent with '[the court's] strong commitment to protecting the freedom of speech and expression' as a matter of Indiana law, even beyond what the [f]irst [a]mendment requires" [citation omitted; emphasis omitted]). A majority of courts, however, have concluded that *Black* did not alter the traditional objective test for determining whether a true threat exists. See, e.g., *United States* v. *Martinez*, 736 F.3d 981, 986 (11th Cir. 2013), petition for cert. filed (U.S. February 21, 2014) (No. 13-8837); *United States* v. *Elonis*, 730 F.3d 321, 332 (3d Cir. 2013), cert. granted, U.S. , 134 S. Ct. 2819, L. Ed. 2d (2014); *United States* v. *Nicklas*, 713 F.3d 435, 440 (8th Cir. 2013); *United States* v. *Jeffries*, 692 F.3d 473, 479–81 (6th Cir. 2012), cert. denied, U.S. , 134 S. Ct. 59, 187 L. Ed. 2d 25 (2013). *United States* v. *White*, 670 F.3d 498, 508 (4th Cir. 2012). In the present case, the defendant does not challenge the objective test traditionally applied by this court when it evaluates whether allegedly threatening language is entitled to first amendment protection, and, in any event, we conclude that the evidence was insufficient to establish a true threat even under that test. We therefore do not decide whether *Black* requires a subjective test.

[11] Our conclusion in this regard is also buttressed by the particular nature of the alleged threat, which Kepple expressly interpreted to mean that the defendant would "do things that [lead] to a car accident . . . ." The state presented no evidence that the defendant had access to Kepple's vehicle or that he possessed the skills or wherewithal necessary to carry out such a threat. Although vehicular sabotage is a ubiquitous plot device in spy novels and movies, it is practically unheard of in the real world, further reinforcing our conclusion that a reasonable listener would be unlikely to interpret the defendant's remarks as a true threat. See, e.g., *United States* v. *Malik*, supra, 16 F.3d 51 (true threat must be "unequivocal, unconditional, immediate and specific as to the person threatened, *as to convey a gravity of purpose and imminent prospect of execution*" [emphasis added; internal quotation marks omitted]); see also *Doe* v. *Pulaski County Special School District*, 306 F.3d 616, 623 (8th Cir. 2002) (whether victim has reason to believe that defendant had propensity to follow through on threat is relevant to true threat inquiry).

We note that Kepple also testified that he feared that the defendant was "capable of anything" in light of his repeated violations of the town's zoning regulations. Specifically, Kepple stated that the defendant "had allowed . . . a nice piece of property to be devalued by . . . his use of the property" and that he "worried that anybody who could trash a property [worth $1,300,000] and then be hit with $30,000 in fines and still engage in the violative behavior that led him to be whacked with a $30,000 [penalty consisting of fines, fees and interest] is capable of anything." Suffice it to say that we do not believe that a person's tendency to hoard or accumulate junk, however bizarre such behavior may seem to others, gives rise to a

reasonable inference that the person is capable of murder or other violent misconduct.

[12] We note, moreover, that, although Kepple testified that the defendant's remarks "terrified" him, he waited two days before reporting the incident to the police. Cf. *State* v. *Moulton*, 310 Conn. 337, 369 n.26, 78 A.3d 55 (2013) ("the fact that [the victim] took no immediate action following the defendant's [comment] and waited [two days] . . . to discuss the matter with [a supervisor] would be relevant evidence as to whether the comment was perceived as a real or true threat"). Kepple's immediate response to the defendant's remarks, which was to call the defendant a series of expletives and taunt him regarding an earlier judgment that the town had won against him, as well as Kepple's statement to Glidden that he did not believe that the defendant had really threatened him, is also inconsistent with the response of a person who believed that the defendant had just communicated a serious threat of injury or death.

———————————————————